## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff,

     v.

LINDSAY FORD LLC and
LINDSAY MANAGEMENT COMPANY,
LLC,

     Defendants.

Civil Action No. TDC-19-2636

## MEMORANDUM OPINION

The United States Equal Employment Opportunity Commission ("the EEOC") filed this civil action against Defendants Lindsay Ford LLC ("Lindsay Ford") and Lindsay Management Company, LLC ("Lindsay Management"), alleging that Janak Maloney, a former car salesperson at Lindsay Ford, was subjected to a hostile work environment that resulted in his constructive discharge, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 (2018). Pending before the Court are Defendants' Motion for Summary Judgment and the EEOC's Cross Motion for Partial Summary Judgment. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be denied, and the EEOC's Cross Motion will be granted.

## BACKGROUND

### I.    Lindsay Ford

Lindsay Ford, LLC owns and operates an automobile dealership located in Wheaton, Maryland. The member-owners of Lindsay Ford, LLC are Michael Lindsay, Charles Lindsay, and

Christopher Lindsay (collectively, "the Lindsay brothers"), three brothers who collectively own nine dealerships and multiple auto body shops that are collectively referred to as the Lindsay Automotive Group. One or more of the Lindsay brothers owns Lindsay Management, the president of which is Michael Lindsay. Lindsay Management provides Lindsay Ford and other dealerships within the Lindsay Automotive Group with various management services, including human resources, payroll, advertising, accounting, and information technology. As relevant here, Lindsay Management provides human resources policies and an employee handbook to Lindsay Ford and advises it on personnel matters such as sick leave and other benefits, employee performance issues, and disciplinary matters. The EEOC has filed this action against both Lindsay Ford and Lindsay Management on the theory that they are one "integrated enterprise." Am. Compl. ¶ 4, ECF No. 28.

## II.    Alleged Harassment

Janak Maloney, who was born in India, is a man of South Asian descent. On or about July 10, 2017, he started work as a new car salesperson at Lindsay Ford. In that position, he reported to intermediate sales managers who in turn reported to Jerry Clark, the General Manager of Lindsay Ford. Clark reported to John Smallwood, the Chief Operating Officer ("COO") of Lindsay Management. Clark spent over half of his time in the new car showroom where Maloney worked.

From the time that Maloney began working at Lindsay Ford, Clark subjected him to repeated insults about his appearance. Clark called Maloney a "serial killer" at least once a day. Joint Record ("J.R.") 513, ECF Nos. 61-64. Clark also called Maloney "crypt keeper" and "grim reaper" on multiple occasions. J.R. 1045. He frequently asked Maloney, "Who are you going to kill tonight?" and "Where do you bury the bodies?" *Id.* Clark also told Maloney that he looked

2

"creepy" and would "scare off customers." J.R. 1044. Several of Maloney's co-workers heard these comments and made similar jokes at Maloney's expense.

On approximately four or five occasions, Maloney told Clark that he did not like being called such names, asked Clark to stop, or otherwise conveyed that the comments made him uncomfortable. In response, Clark laughed and walked away, then began to harass Maloney even more frequently. On one occasion in August 2017, Maloney confronted Clark during lunch and asked why he was calling Maloney a serial killer. Clark replied that it was because Maloney was "a creepy brown person." J.R. 1044. He then told Maloney that he was "surprised [Maloney] had not scared off more customers" because of the way he looks, and that he was surprised that Maloney was actually selling vehicles. *Id.*

Clark also called Maloney other derogatory terms such as "retard" and "stupid." J.R. 1046. On one occasion, Clark and other sales managers instructed Maloney to wear a lemur costume and stand outside the dealership. Maloney attempted to refuse, but Clark ordered him to put it on, and a sales manager told Maloney that he would be fired if he did not. Maloney complied. Clark also frequently threw wads of paper at Maloney and other employees and once threw a full plastic water bottle at Maloney while yelling at him. When Maloney asked Clark to stop throwing objects at him and told Clark that he was attempting to work or on the phone with a client, Clark did not appear to care. Maloney's complaints did not cause Clark to stop throwing objects at him.

Clark also engaged in harassing behavior toward Maloney that was sexual in nature. He regularly called Maloney "gay" and "bitch," asked Maloney if he was cheating on his wife with a co-worker, and falsely told Maloney that a female customer had filed a complaint accusing Maloney of touching himself inappropriately in the workplace and directed Maloney to write an apology to that customer. J.R. 1046; J.R. 1075. Although Maloney wrote a lengthy apology in an

3

email, Clark kept the charade going for a week, warned Maloney that he had to apologize or he would be fired, and falsely claimed that this customer was going to file a report with the police.

On September 1, 2017 at approximately 5:00 or 6:00 p.m., while Maloney was in or near the new car showroom finalizing a truck sale, Clark called Maloney a "serial killer" and asked him, "Who are you going to kill tonight?" and "Where do you hide the bodies?" J.R. 1053. Clark then stood up to leave, walked behind Maloney, grabbed his right buttock, and squeezed it. Maloney froze, started feeling "physically ill" and "light-headed," and started sweating. J.R. 505. He felt unsafe as he recalled traumatic events from his past. The next day, September 2, 2017, Maloney went to work but had trouble performing his duties because he continued to experience such feelings. He eventually informed a sales manager that he was feeling sick and nauseous and left work early. That was the last day Maloney reported to work at Lindsay Ford.

### III.    Maloney's Complaint

On September 5, 2017, Maloney sent an email to Sherry Pfost, the Comptroller of Lindsay Ford, and Elaina Grant, the Human Resources Director at Lindsay Management, entitled "Official Complaint of Sexual/Racial Harassment." J.R. 466. In the email, Maloney reported that Clark had been sexually and racially harassing him. He stated that Clark repeatedly called him a "serial killer" and had told him that he did so because Maloney was a "creepy brown person," that Clark regularly called him other names like "retard" and "bitch," that Clark threw water bottles and wads of paper at him, and that Clark sexually assaulted him on September 1, 2017. J.R. 467.

In response, Grant set up a telephone call among Maloney, Pfost, and Grant on September 6, 2017. During that initial call, Grant and Pfost asked Maloney how he would feel about working in the Lindsay Ford Service Department, which was in the same building as the new car showroom where Clark spent most of his time. Maloney stated that he would not feel comfortable working

in that area of the dealership. In other calls later the same day, Grant told Maloney that Defendants had begun investigating his complaint and asked if he would be interested in working at another dealership. Grant ultimately offered Maloney two options: (1) remain at Lindsay Ford in a different division but still reporting up to Clark; or (2) apply to work at Lindsay Volkswagen in Sterling, Virginia, which was 38 miles from Maloney's home in Silver Spring, Maryland. The job at Lindsay Volkswagen was not guaranteed; rather, Maloney would have to interview with the manager there and be selected. Maloney told Grant that neither option would work for him. Maloney was not told that Clark would receive any discipline.

Maloney had no further discussions with Grant, Pfost, or any other representative of Defendants. Also on September 6, 2017, Maloney reported Clark's assault to the Montgomery County Police Department in Wheaton, Maryland. On September 8, 2017, Pfost approved termination paperwork for Maloney which stated that he had resigned because he was "dissatisfied" with his supervisor and working conditions. J.R. 482.

Meanwhile, on September 5, 2017, Pfost began an internal investigation of Maloney's complaint. She first spoke with Clark, who denied calling Maloney a "creepy brown person" or groping Maloney. J.R. 245. He admitted, however, that he had called Maloney "serial killer" and "weird," J.R. 252-53, and had thrown objects at employees. On September 5, 2017, Pfost issued a written warning to Clark to "stop throwing paper" and to "cut[] back the joking and playing around in the showroom." J.R. 633. Pfost then interviewed other Lindsay Ford employees, some of whom corroborated that Clark called Maloney a serial killer. Several employees reported that Clark had "asked the sales people to have his back" that week, which Pfost understood to mean that he had asked employees to not speak with her during the investigation. J.R. 262.

After Pfost completed the investigation, on or around September 12, 2017, Pfost and Grant spoke with Smallwood, the COO of Lindsay Management and Clark's direct supervisor, and received his approval to discipline Clark by deducting $10,000 from his $240,000 base salary for the year. On September 12, 2017, Grant and Pfost met with Clark and issued a "Disciplinary Action" imposing the $10,000 pay reduction which stated Clark had created "a negative environment under [his] management" and warned him that if "anything like this happens again it could be grounds for termination." J.R. 636. The form listed Smallwood as Clark's supervisor but was signed by Grant. Clark refused to sign the paper until he spoke with Smallwood. Clark later met with Smallwood and told him that his behavior would not be an issue moving forward, but he did not sign the form. Clark received no further disciplinary action relating to Maloney's complaint. In May 2018, however, when another Lindsay Ford employee, Andrew Karras, complained to Pfost that Clark had been harassing him, including by having another employee follow Karras to determine whether he was dating a co-worker, Smallwood decided to terminate Clark. On May 11, 2018, Clark resigned rather than be terminated.

On September 12, 2017, Maloney filed a charge of discrimination with the EEOC. On September 11, 2019, the EEOC filed the original Complaint in this case. In the now pending Amended Complaint, the EEOC alleges that Maloney was subjected to a hostile work environment based on race, national origin, and sex, and that he was subjected to a constructive discharge, all in violation of Title VII.

## DISCUSSION

In their Motion for Summary Judgment, Defendants argue that based on the record evidence, the EEOC cannot establish facts sufficient to establish either a hostile work environment claim or a constructive discharge claim. Defendants also argue that the EEOC has failed to

6

establish a separate disparate treatment claim, Mot. Summ. J. at 14, ECF No. 56-2, but the EEOC did not allege such a claim in its Amended Complaint or discuss it in its memorandum in opposition to the Motion, so the Court does not address this argument.

The EEOC argues that there is a genuine issue of material fact precluding summary judgment on the hostile work environment and constructive discharge claims, and it asserts in its Cross Motion for Partial Summary Judgment that the undisputed facts establish that Lindsay Ford and Lindsay Management operate as an integrated enterprise for purposes of a Title VII claim.

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.     Hostile Work Environment

Defendants argue that based on the record evidence (1) the EEOC cannot establish a Title VII claim of a hostile work environment based on race, national origin, or sex; and (2) even it if could, the evidence establishes that Defendants have a successful affirmative defense under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ("the *Faragher/Ellerth* defense"), because they exercised reasonable care to prevent or correct harassment, and Maloney failed to take reasonable care in availing himself of preventive or corrective opportunities.

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).  To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the plaintiff's race, color, religion, national origin, age, or sex; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.  *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006).  Here, there is no dispute that Clark's treatment of Maloney was unwelcome conduct.  *See Strothers v. City of Laurel*, 895 F.3d 317, 328-29 (4th Cir. 2018) (stating that this prong "is not a high hurdle" and can be established by an employee's voicing of an objection to the alleged harasser or to the employer").  The Court will address the remaining three prongs in turn.

A.     **Based on Race, National Origin, and Sex**

Defendants' primary argument is that the evidence does not support a finding that Clark's harassment of Maloney was "because of" race, national origin, or sex. 42 U.S.C. § 2000e-2(a). Harassment "need not be accompanied by a contemporaneous statement of animus . . . rather, the connection between animus and conduct may be inferred from the totality of the circumstances." *Strothers*, 895 F.3d at 330-31. Defendants argue that the harassment was not based on race or national origin because (1) Clark was unaware of these aspects of Maloney's identity; (2) Clark's statements were not overtly racial in nature and were instead merely "unkind and rude," Mot. Summ. J. at 16; and (3) Clark engaged in comparable or more severe harassment of employees of other backgrounds.

On the first point, although Clark has asserted that Maloney has light skin and has claimed that he did not know Maloney's race or national origin, Maloney has reported that when he asked Clark why he repeatedly called him a serial killer, Clark told him that he did so because Maloney was a "creepy brown person," a statement which plainly reflects knowledge of Maloney's race or national origin. J.R. 1044. On at least one occasion, Clark loudly played Indian film music, or Bollywood music, from his computer when Maloney was nearby, even though Clark did not otherwise listen to such music. Moreover, Maloney testified that he regularly told co-workers, or "most everybody," of his background including that he was from India. J.R. 502-03. One of Maloney's co-workers, Sabrina Burns, testified that Maloney had told her that he was either Pakistani or Indian, and another, Brooke Young, stated that she was aware that he was of foreign origin. Thus, even though Clark denies calling Maloney a "creepy brown person," there is, at a minimum, a genuine issue of material fact on whether Clark was aware of Maloney's race and national origin.

9

Second, because Clark's statement that he called Maloney a "serial killer" because he was a "creepy brown person" plainly reflected a racial motivation for his daily comments about Maloney's appearance and his related inquiries as to where Maloney "buried the bodies" or who Maloney was planning to kill, there is evidence supporting the conclusion that all of those insulting statements were motivated by discriminatory animus. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (holding that evidence supporting a finding that harassment was based on religion included the fact the employee was "consistently teased about his appearance, particularly his kufi and beard"). In turn, where Maloney has identified evidence of a racial motivation for the harassment, Clark's otherwise racially neutral harassing behavior in the same time frame, including throwing objects at Maloney and requiring him to wear a lemur costume, can be construed as also motivated by Maloney's race or national origin. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010) (stating that that "a rational juror could permissibly infer that [an] entire alleged pattern of harassment . . . was motivated by . . . gender, even though some of the harassment was not facially sex-based" where there was at least some "overtly sexual" harassment); *Howley v. Town of Stratford*, 217 F.3d 141, 156 (2d Cir. 2000) (holding that where a male co-worker had previously engaged in an explicitly gender-based rant, a factfinder could conclude that other facially-neutral harassment of a female firefighter was based on sex).

Such a conclusion is bolstered by the additional record evidence that Clark made derogatory statements about, or otherwise denigrated, South Asian or Middle Eastern customers. *See Kaytor*, 609 F.3d at 548 (finding that derogatory statements by the alleged harasser about women other than the plaintiff could be considered in "determining whether the abuse" against the plaintiff "was motivated by her gender"). One Lindsay Ford employee reported that Clark routinely imitated Indian and other Asian accents and speech and frequently stated that Asian

10

customers, including those from India, were "cheap" and "liked to haggle." J.R. 1071. On one

occasion, Clark stated that a male customer wearing a tunic who appeared to be of South Asian or

Middle Eastern descent "might blow up the dealership." J.R. 1072. Clark also made jokes about

customers whose last names were of Middle Eastern origin, including one named Dadi Mahmoud,

and on multiple occasions outright refused to speak with customers with foreign accents or with

last names of Middle Eastern origin. Just as Clark played Bollywood music when Maloney was

present, he appeared to deliberately play other international music from his computer when other

foreign employees and customers were nearby. Upon consideration of the totality of the

circumstances, the EEOC has demonstrated a genuine dispute of material fact on whether Clark's

harassment of Maloney was based on race or national origin.

As for sex, Defendants do not put forth any specific argument as to why Clark's harassment

of Maloney was not based on sex. Same-sex sexual harassment is cognizable under Title VII.

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). In *Oncale*, the United States

Supreme Court identified several methods of demonstrating that same-sex sexual harassment is

sex-based, including that a plaintiff may show "evidence that the harasser was homosexual,"

evidence "that the harasser is motivated by general hostility to the presence of [that sex] in the

workplace," or "comparative evidence about how the alleged harasser treated members of both

sexes in a mixed-sex workplace." *Id.* at 80-81. More recently, the United States Court of Appeals

for the Fourth Circuit has emphasized that same-sex sexual harassment is not limited to these three

methods and may be established based on other sex-based motivations, including "a plaintiff's

failure to conform to sex stereotypes." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 120 (4th

Cir. 2021). Where the EEOC has presented evidence that Clark engaged in harassment that was

sexual in nature—including calling him "gay" and "bitch," physically groping Maloney,

displaying pornography in front of him, and sending a fake email to Maloney accusing him of touching himself in front of a customer—and Defendants have not provided a specific argument as to why this harassment was not based on sex, summary judgment is not warranted on this claim.

The Court's conclusions are not altered by Defendants' argument that Clark's harassment was not based on race, national origin, or sex because his conduct was "typical to the workplace" and directed at individuals of all backgrounds. Mot. Summ. J. at 17. The Fourth Circuit has rejected the existence of an exception to a Title VII hostile work environment claim because there is an "inherently coarse" or generally "crude environment." *Sunbelt Rentals, Inc.*, 521 F.3d at 318. Although a jury may consider whether a work environment is "so universally crude that the treatment of [the employee] was nothing out of the ordinary," "the jury could also take the opposite view—that the harassment . . . was unique." *Id.* Here, the evidence establishes that Clark engaged in repeated and abusive harassment of Lindsay Ford employees of other backgrounds. However, Maloney and others have stated that such general abuse, such as calling an employee "stupid" or "retard," was more frequently directed at non-white employees. J.R. 1046; J.R. 1075. Notably, a second employee who was instructed to wear the lemur costume was a Black employee. Moreover, Clark's harassment of Black employees included derogatory statements focused on their race: he repeatedly referred to a Black employee as "boy" and "ghetto" and stated that another Black employee's dreadlocks "looked awful." J.R. 903. He mimicked African American and African accents and speech, including what he called "ghetto" speech, when speaking to Black employees and customers, J.R. 1071, and likewise used stereotypical speech patterns and accents associated with Hispanic individuals and people from certain foreign countries when speaking with or about employees and customers of those backgrounds. He also discriminated against Black customers by instructing employees to run credit checks on Black and other non-white customers but not on

12

white customers before showing them cars, stating that Black customers usually do not buy cars, and making jokes about individuals with African last names and refusing to talk to some who had African accents or names. Particularly where Clark used different language with other employees that was specifically derogatory to individuals of their backgrounds, a jury could fairly conclude from Clark's harassment of so many Lindsay Ford employees not that the harassment was unrelated to race and national origin, but rather that Clark was engaging in racial harassment against multiple groups—including Black employees and South Asian employees. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (noting that an employer who discriminates against both men and women based on their sex as a result of different stereotypes does not "avoid[] Title VII exposure" but instead "doubles it").

Defendants similarly argue that Maloney was not harassed based on race or national origin because Andrew Karras, a white male employee, was "treated more harshly" than Maloney. Mot. Summ. J. at 20. As with Maloney, Clark frequently referred to Karras as "gay," J.R. 1060, and had a fake customer complaint sent to Karras claiming that he touched himself in the workplace then forced Karras to apologize. Clark also directed additional harassment at Karras, including subjecting him to viewing gay pornography and having another employee create a fake social media account to impersonate Karras, connect and message with his family members and co-workers, and post that Karras was "gay." J.R. 263. However, a reasonable jury could conclude that Karras, like Maloney, was being subjected to sex-based harassment based on failure to conform to gender stereotypes. Indeed, Maloney has asserted that Clark referred to men he deemed effeminate as "gay" and has noted that Clark has commented on Maloney's choice of clothing, which includes "pink or colorful clothing." J.R. 1051. As for the argument that Clark also harassed women, such harassment was different in nature. Rather than calling them "gay" or

13

"faggots," subjecting them to gay pornography, or falsely asserting that a customer complained that they had touched themselves in a sexual way, Clark made inappropriate comments about the bodies of female employees, told them to "sit there and look pretty," asked to see their dating applications, and groped their bodies. J.R. 1060, 1075. Where the evidence shows that male and female employees were subjected to harassment based on different gender stereotypes, a reasonable factfinder could conclude that Clark was engaged in sexual harassment of both men like Maloney and also women. *See Bostock*, 140 S. Ct. at 1741; *Brown v. Henderson*, 257 F.3d 246, 254-55 (2d Cir. 2001) (stating that the "inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved" because there may be circumstances where both suffer "sexually discriminatory harms in the same workplace, but for different reasons").

For these reasons, the Court finds that the evidence is sufficient to support a finding that Clark's harassment was based on race, national origin, and sex.

### B.    Severe or Pervasive

The third prong is whether Clark's conduct was sufficiently "severe or pervasive" to alter the conditions of Maloney's employment and "create an abusive or hostile atmosphere." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). This element has both subjective and objective components. *Id.* As to the subjective component, the plaintiff must have subjectively perceived the environment to be hostile or abusive. *Id.* Here, Maloney repeatedly expressed his discomfort with the harassment and requested that Clark stop calling him a "serial killer" and throwing objects at him. J.R. 513. After Clark groped him, Maloney struggled to function, felt light-headed, sweaty, and nauseous, had to leave work early, and later filed a police report about Clark's behavior. These facts are sufficient to establish this prong. *See Cent.*

*Wholesalers, Inc.*, 573 F.3d at 176 (finding that a plaintiff's emotional distress and complaints to supervisors met the subjective component).

In assessing whether the objective prong is satisfied, courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). No "single factor is dispositive" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 176 (citations omitted).

Here, a reasonable jury could find that the harassment was objectively severe or pervasive. In the two months that Maloney was at Lindsay Ford, Clark harassed him daily about his appearance by referring to him as a "serial killer," made other offensive comments including that he was a "creepy brown person," and engaged in other humiliating, harassing conduct including throwing objects at him, playing Bollywood music when he was present, and forcing him to wear a lemur costume. *See Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (finding that a reasonable person could "easily" find an atmosphere hostile where the plaintiff's supervisor called him discriminatory names "almost daily" and engaged in other facially neutral harassing behavior, including "intentionally [trying] to embarrass him"). Notably, Maloney testified that Clark would "get more aggressive" when verbally harassing Maloney, including "try[ing] to prop himself up and spread out his shoulders" and speaking more firmly to him than to others. J.R. 514. Clark also frequently engaged in harassment of a sexual nature that was humiliating, including calling him "gay" and a "bitch," J.R. 1046, 1075, showing pornography,

15

and faking a customer complaint that he touched himself in a sexual way. This harassment included a physical assault when Clark grabbed Maloney's buttocks.

The fact that Clark was Maloney's second-level supervisor and the highest-level manager at Lindsay Ford increases the severity of the conduct because "a supervisor's power and authority invests his . . . harassing conduct with a particular threatening character" that "impacts the work environment far more severely" than that of a co-worker. *Boyer-Liberto*, 786 F.3d at 278 (internal citations omitted). Taken together, the frequency of the harassment, the physical groping of Maloney, and Clark's status as a supervisor provide a sufficient basis to support a conclusion that the harassment was objectively severe or pervasive.

### C.     Basis for Imposing Liability

The final prong of a hostile work environment claim is that there is a basis for imposing liability on the employer. Under Title VII, if the "harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions." *Strothers*, 895 F.3d at 333. "An employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807. Where Clark was a second-level supervisor to Maloney and the highest-ranking manager at Lindsay Ford, this requirement is satisfied.

### D.     *Faragher/Ellerth* Defense

Although the evidence is sufficient to establish each element of a hostile work environment claim, Defendants argue that they are nevertheless entitled to summary judgment because they have conclusively shown the applicability of the *Faragher/Ellerth* defense. Under this defense, an employer may not be vicariously liable for a hostile work environment created by a supervisor if (1) it "exercised reasonable care to prevent and correct promptly" any harassing behavior; and

16

(2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *See id.* at 807. The defense is not available if the hostile work environment resulted in a "tangible employment action," consisting of "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

The EEOC argues that the defense is unavailable here because Maloney was subjected to a constructive discharge, which it asserts to be a tangible employment action precluding Defendants' invocation of the *Faragher/Ellerth* defense. Opp'n Mot. Summ. J. at 46. The Court need not reach the question of whether the constructive discharge alleged by Maloney qualifies as a "tangible employment action." *See Penn. State Police v. Suders*, 542 U.S. 129, 140-41 (2004). Even assuming that there was no tangible employment action that would preclude consideration of the *Faragher/Ellerth* defense, Defendants have failed to establish that there is no genuine issue of material fact as to both prongs of the defense, as would be required to secure summary judgment.

In particular, Defendants have not established conclusively that they "exercised reasonable care to prevent and correct promptly" any harassing behavior. *Faragher*, 524 U.S. at 807. "An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent any sexually harassing behavior." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir. 2000). However, "any policy adopted by the employer must be both reasonably designed and reasonably effectual." *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999). Here, a reasonable factfinder could find that Defendants' policy was not reasonably effectual because it did not make certain that an employee could report harassment by Clark, the General Manager and highest-ranking manager at the dealership, through an

17

independent channel not involving Clark. In *Faragher*, the Supreme Court held that an employer could not be found to have exercised reasonable care as a matter of law in part because its policy "did not include any assurance that the harassing supervisors could be bypassed in registering complaints." 524 U.S. at 808. The policy that Maloney signed, Defendants' January 2012 "Professional Conduct and Sexual Harassment Policy," provides no such assurance and instead provides only that employees should report harassment "to a manager with whom you are comfortable or the dealer and/or general manager." J.R. 1143. Moreover, where *Faragher* also noted that the failure to disseminate an anti-harassment policy among the employees weighs against a finding of reasonable care in preventing harassment, at least one Lindsay Ford employee testified that Defendants did not permit employees to keep a copy of the employment manual which included the harassment policy. Instead, even though employees like Maloney signed a copy of the policy, J.R. 1143, Defendants "keep their whole packet." J.R. 800.

Even if Defendants' anti-harassment policy contained no deficiencies, there remains a genuine issue of material fact on whether Defendants "exercised reasonable care" to "correct promptly" the harassment reported by Maloney. First, a reasonable factfinder could conclude that Pfost's investigation was not carried out with reasonable care. Pfost had never received any specialized training on how to conduct a workplace investigation, had never conducted such an investigation, and did not obtain written statements from witnesses, keep notes from her interviews, or even write down the names of everyone she interviewed. *See Smith*, 202 F.3d at 245 (holding that an investigation was "inadequate" in part because the investigator had never previously investigated a harassment claim). Pfost did not take notes on her interview of Clark. Though Pfost was told that Clark asked the sales force to "have his back" during the investigation

of Maloney's complaint, J.R. 1135, there is no evidence that she took any action against Clark for this attempt to interfere with the investigation.

A reasonable factfinder could also conclude that Defendants' corrective action was inadequate. Although Pfost's investigation led to employee corroboration of at least some of Maloney's allegations, including the repeated references to Maloney as a "serial killer" and the throwing of paper at employees, and Pfost learned that Clark called other employees "gay" and "bitch" and had subjected a second employee to a fake customer complaint that the employee had touched his genitals in front of her, J.R. 637, Clark was not required to undergo any anti-harassment training. The only discipline imposed was a written warning issued on September 5, 2017 and a $10,000 fine issued on September 12, 2017 that represented only a fraction of Clark's compensation of $240,000 in salary plus 20 percent of net profits. Particularly where Clark apparently persisted in harassing employees until he resigned in May 2018 as a result of a complaint by Karras, a reasonable factfinder could conclude that Defendants' efforts to "correct promptly" the harassment were inadequate. *See Faragher*, 524 U.S. at 807.

Because Defendants must establish both *Faragher/Ellerth* elements to successfully assert the defense, and the Court has determined that a reasonable factfinder could conclude that Defendants failed to exercise reasonable care to prevent and correct the harassing behavior, the Court need not reach the issue of whether Maloney "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm." *Id.* In any event, contrary to Defendants' claim, the fact that Maloney did not report the harassment until approximately two months after it began does not establish as a matter of law an unreasonable failure to take advantage of preventive opportunities, particularly in light of the issues identified with Defendants' anti-harassment policy, Maloney's multiple direct efforts to convince Clark to

stop the harassment, and the fact that Maloney immediately reported the harassment after Clark physically assaulted him. *See, e.g., Hardy v. Univ. of Illinois at Chicago*, 328 F.3d 361, 365-66 (7th Cir. 2003) (holding that a near three-month delay in filing a complaint with the proper office after the employee tried to "deal with [the harasser] directly to change his behavior" is not unreasonable as a matter of law).

Further, a reasonable factfinder could also conclude that the corrective opportunities offered to protect Maloney from further harassment were inadequate. On September 6, 2017, before the internal investigation was completed, Pfost and Grant offered Maloney two options to remedy the alleged harassment: a transfer within Lindsay Ford, such as to the Service Department, that would have left him still reporting to Clark, or the opportunity to interview for a position at another Lindsay dealership 38 miles away in Sterling, Virginia, for which the transfer was not guaranteed. Where one option would leave Maloney in a position less desirable to him and still subject to interactions with his harassing supervisor, and the other did not guarantee employment and would in any event require him to endure a lengthy commute, a reasonable jury could determine that Maloney's rejection of these flawed options was not unreasonable.

Because the record does not support the conclusion that Defendants have established the *Faragher/Ellerth* defense as a matter of law, the Court will deny the Motion as to the hostile work environment claim.

### III.    Constructive Discharge

Defendants also seek summary judgment on the EEOC's constructive discharge claim. To prove a constructive discharge, a "plaintiff must show 'something more' than the showing required for a hostile work environment claim." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Suders*, 542 U.S. at 147). The plaintiff must "show working conditions so intolerable

that a reasonable person would have felt compelled to resign." *Suders*, 542 U.S. at 147. Intolerability is "assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign . . . that is, whether [the employee] would have no choice but to resign." *Evans*, 936 F.3d at 193 (internal citation omitted). The "frequency of the conditions at issue is important" as "[t]he more continuous the conduct, the more likely it will establish the required intolerability." *Id.*

Even under this higher standard, the Court finds that the evidence is sufficient to support a finding of a constructive discharge. Viewed in the light most favorable to the EEOC, the evidence establishes that Clark called Maloney a "serial killer," which Maloney understood to be because he was a "creepy brown person," at least daily, and that Maloney was subject to an array of other verbal harassment and humiliating incidents such as being forced to wear a lemur suit and to write an apology to response to a fake customer complaint that he had touched his genitals in the workplace. He was also subjected to other sexually charged harassment that culminated in Clark's physical grabbing of his buttocks, which left him feeling physically ill, light-headed, and unsafe as he recalled traumatic events from his past. As discussed above, after Maloney complained, Defendants conducted a brief investigation, issued a warning and a one-time salary deduction but allowed Clark to continue in a position to harass Maloney, and presented Maloney with two options that could reasonably be deemed to be inadequate solutions. *See supra* part II.D. On this record, the Court finds that there is, at a minimum, a genuine issue of material fact as to whether Maloney's working conditions were so intolerable that a reasonable person would have felt compelled to resign. *See Amirmokri*, 60 F.3d at 1132 (holding that a reasonable trier of fact could find a constructive discharge where the plaintiff was subjected to near-daily epithets and attempts to

embarrass him in public).  The Motion will therefore be denied as to the constructive discharge claim.

## IV.    Integrated Enterprise

In its Cross Motion for Partial Summary Judgment, the EEOC seeks summary judgment on the issue of whether Lindsay Ford and Lindsay Management may be treated as an "integrated enterprise" or "integrated employer," which would subject both to liability under Title VII. *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 n.3 (4th Cir. 2015); U.S. Equal Emp. Opportunity Comm'n, Compliance Manual:  Section 2 Threshold Issues, § 2(III)(B)(1)(a)(iii)(a) (May 12, 2000), https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-III-B-1-a-iii-(a) (last visited Nov. 2, 2021) (defining an integrated enterprise as "one in which the operations of two or more employers are considered so intertwined that they can be considered [a] single employer" under Title VII); *see* 42 U.S.C. § 2000e (defining the term "employer").  Although the parties disagree on whether Defendants were an integrated enterprise, neither party has identified any disputes of material fact on this issue.  Accordingly, the issue is ripe for the Court to decide as a matter of law.

For purposes of a Title VII claim, multiple companies may be "so interrelated that they constitute a single employer" under the integrated enterprise test. *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006); *see Butler*, 793 F.3d at 408 n.3 (recognizing the doctrine's applicability in the Title VII context).  In determining whether such companies comprise an integrated enterprise, courts consider factors including "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control."

*Hukill*, 192 F.3d at 442. While "no single factor is conclusive," "control of labor relations is the most critical factor." *Id.*

Starting with the degree of common ownership and financial control, the Court finds that this factor weighs in favor of a finding of an integrated enterprise. The member-owners of Lindsay Ford are the Lindsay brothers—Christopher, Charles, and Michael Lindsay—each of whom has a 33.33% ownership interest. Michael Lindsay is also the President of Lindsay Management. As to common management, Lindsay Ford has a separate corporate existence and, as a dealership, has its own General Manager responsible for its day-to-day operations and the hiring and firing of dealership-level employees. However, Lindsay Ford does not have its own executive suite and instead relies on Lindsay Management's Chief Operating Officer, Chief Financial Officer, Chief Marketing Officer, General Counsel, and Human Resources Director. The General Manager of Lindsay Ford reports to the Chief Operating Officer of Lindsay Management. Any large expenditures made by Lindsay Ford must be approved by Lindsay Management. Lindsay Management also reviews and approves Lindsay Ford's federal and state tax returns.

As for interrelation between operations, Lindsay Management provides a wide range of services that assist Lindsay Ford's operations, including advertising, marketing, accounting, information technology, and maintaining a shared website. As relevant here, Lindsay Management provides payroll services for Lindsay Ford, and Maloney's Internal Revenue Service Form W-2 stated that his employer was Lindsay Management, not Lindsay Ford. While these factors illustrate numerous ways in which there is an interrelationship between the operations of Lindsay Ford and Lindsay Management, they do not, alone, establish that the two constitute an integrated enterprise. *See Hukill*, 192 F.3d at 439, 443-44 (holding that several entities, including multiple

service stations and tire centers, were not integrated despite the fact that one provided administrative services such as payroll, bookkeeping, and healthcare benefits to the others).

Here, however, the centralized control of labor relations factor heavily favors treating the two companies as an integrated enterprise because Lindsay Management exercised significant control over personnel matters.  Although Lindsay Ford handled its own hiring of lower-level employees, it used general job descriptions and job application forms issued by "Lindsay Automotive Group," rather than Lindsay Ford, J.R. 468, 472, and Lindsay Management established certain requirements, such as those relating to drug testing and background checks, that had to be followed in the hiring process.  Although Pfost, as the comptroller of Lindsay Ford, handled personnel issues for that dealership, Grant, an employee of Lindsay Management, was the Human Resources Director for Lindsay Ford.  In that role, Grant was responsible for the content of the employee handbook used by Lindsay Ford and the harassment policy at issue here.  Pfost had no role in formulating these policies.  Lindsay Management also had copies of the personnel files of all Lindsay Ford employees, and it provided human resources advice and guidance to Lindsay Ford on issues relating to sick leave, medical leave, employee benefits, employee performance and discipline, and issues involving the EEOC.  Where there is such involvement in personnel matters, courts have found that entities such as Lindsay Management—a company established to provide management services to multiple car dealerships under common ownership or management—could be an integrated enterprise with a dealership.  *See, e.g., Paskert v. Kemna-Asa Auto Plaza, Inc.*, No. C17-4009-LTS, 2018 WL 5839092, at *10 (N.D. Iowa Nov. 7, 2018) (holding that a reasonable jury could find that a car dealership and related companies constituted an integrated enterprise where they had common ownership and management and one company provided human resources services for the dealership), *aff'd*, 950 F.3d 535 (8th Cir. 2020); *Perez*

24

*v. Westchester Foreign Autos, Inc.*, No. 11 Civ. 6091, 2013 WL 749497, at *8 (S.D.N.Y. Feb. 28, 2013) (holding that the complaint sufficiently alleged that a corporation that owned multiple dealerships was an integrated enterprise with one of the dealerships where there was a common employee handbook containing policies for all dealerships and a website advertised the entities as a family-owned group of automotive dealerships); *EEOC v. Moreland Auto Group, LLLP*, No. 11-cv-1512, 2012 WL 2974670, at *2-3 (D. Colo. July 20, 2012) (holding that there was sufficient evidence to support a finding that a company comprised an integrated enterprise with a car dealership where one individual working for the company handled payroll and hiring issues, created personnel policies and the employee handbook used by multiple dealerships, and engaged with the dealerships on personnel matters, including transfers, policy violations, and sexual harassment).

Beyond Lindsay Management's general role in the personnel matters of Lindsay Ford, a key inquiry here is which "entity made the final decisions regarding employment matters related to the person claiming discrimination." *Hukill*, 192 F.3d at 444 (internal citation omitted). In this instance, it is undisputed that Grant and Smallwood, both Lindsay Management employees, were deeply involved in Defendants' response to Maloney's complaint and the subsequent investigation. Maloney's email complaint of discrimination was addressed to both Pfost and Grant, and Pfost's initial reaction upon reviewing it was to call Grant to discuss it. In response to the complaint, Grant responded directly to Maloney to arrange a discussion, and Pfost and Grant jointly presented their proposed corrective solutions to Maloney. Grant's participation was crucial because in the past requests for transfers to another dealership had involved discussions with Lindsay Management officials, including Smallwood or Grant, because such transfers required the approval of the general managers of both dealerships, over whom Pfost lacked authority.

Further, Lindsay Management was directly involved in the decisions on whether and how to discipline Clark for his harassment. Because Clark was the highest-level manager at Lindsay Ford and reported to Smallwood, the COO of Lindsay Management, neither Pfost nor anyone else at Lindsay Ford could discipline Clark without Smallwood's approval. Thus, the September 12, 2017 Disciplinary Action deducting $10,000 from Clark's salary was signed by Grant, on behalf of Smallwood, and issued only after Pfost and Grant spoke with Smallwood who "gave the okay . . . to write up" Clark. J.R. 277. Notably, Clark refused to sign the form when it was presented to him and instead requested to speak with Smallwood, his supervisor. Indeed, it is undisputed that no one at Lindsay Ford had the authority to terminate Clark and that only Smallwood or the Lindsay brothers could do so. As a result, when another complaint against Clark was made in 2018, Pfost again provided her findings to Smallwood to decide on potential discipline of Clark, and Smallwood then told Clark that he would be terminated if he did not resign. The fact that Lindsay Management was directly involved in the decisions relating to both Maloney and Clark that are at the center of the present case weighs heavily in favor of a finding of an integrated enterprise. *See Torres-Negron v. Merck & Co., Inc.*, 488 F.3d 34, 43 (1st Cir. 2007) (holding that there was "a significant amount of evidence weighing in favor of a single-employer finding" applying to a parent company and two subsidiaries where the applicable personnel policies upon which the termination was based were provided by the parent company, the process leading to the plaintiff's alleged discriminatory termination "evince[d] centralized, top-down control over employment decisions," and the parent company approved the actual termination decision).

On this record, where the undisputed facts reveal that all of the factors are consistent with an integrated enterprise, and that Lindsay Ford and Lindsay Management were both deeply involved in the employment decisions at issue here, the Court concludes that the two operated as

26

an integrated enterprise.  The EEOC's Cross Motion for Partial Summary Judgment will therefore be granted.

<strong>CONCLUSION</strong>

For the foregoing reasons, Defendants' Motion for Summary Judgment will be DENIED. The EEOC's Cross Motion for Partial Summary Judgment will be GRANTED.  A separate Order shall issue.

Date:   November 2, 2021

THEODORE D. CHUANG
United States District Judge

27